# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Marchelo D. Garrett,
     Petitioner

       vs.                        Case No. 1:05cv102
                                 (Weber, S.J.; Hogan, M.J.)

Ernie Moore,
     Respondent

## REPORT AND RECOMMENDATION

     Petitioner, who is in state custody at the Lebanon Correctional Institution in Lebanon, Ohio, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] This matter is before the Court on the petition and respondent's "Answer/Return Of Writ" with exhibits. (Docs. 1, 3).

---

[1]As discussed in a prior Order issued September 27, 2006, it appears from the face of the petition that petitioner's father assisted in the preparation and filing of the petition. (*See* Doc. 1, p. 15; Doc. 6). Because it was unclear whether the petition was filed by a person with standing to initiate the instant action, the Court ordered petitioner to show cause why the instant petition is not subject to summary dismissal. (*See* Doc. 6). On October 25, 2006, petitioner responded to this Order by requesting leave to amend his petition to reflect that he is the "sole litigator in the instant petition" and by asking the court to "entertain his [petition for] writ of habeas corpus." (Doc. 7). Because petitioner has clarified the ambiguity appearing from the face of the petition, the petition is deemed AMENDED as requested by petitioner to reflect that petitioner is the "sole litigator" in this matter and that petitioner thus filed or otherwise approved the filing of this action on his behalf.

## Factual And Procedural Background

On December 27, 2001, the Butler County, Ohio, grand jury issued an indictment against petitioner and two co-defendants, Joshua Hibbard and Brad Bowling, wherein petitioner was charged with one count of kidnapping in violation of Ohio Rev. Code § 2905.01(B)(2) (Count Six); one count of aggravated burglary in violation of Ohio Rev. Code § 2911.11(A) (Count Seven); and one count of murder in violation of Ohio Rev. Code § 2903.02(B) (Count Eight).  (Doc. 3, Ex. 1).  The incident giving rise to these charges involved the following facts, as found by the Ohio Court of Appeals, Twelfth Appellate District, in the direct appeal proceedings:[2]

> On November 27, 2001, Greg Peck was playing cards in his apartment with a friend, Joshua Hibbard.  At approximately 2:30 a.m., Mike Garrett, appellant, and Brad Bowling went to Peck's apartment.  They knocked at the door and were invited inside.  Once inside the apartment, Mike Garrett, appellant, and Bowling brandished firearms.  Mike Garrett held a knife to Peck's head.  Mike Garrett wanted appellant and Bowling to accompany him to Peck's apartment because Peck had "done him wrong" on a drug deal.  During the attack, Mike Garrett and Bowling threatened to kill the occupants of Peck's apartment if the police came to the door.

> At some point in the altercation, Hibbard knocked the gun out of appellant's hand.  Hibbard then pulled a Glock .357 pistol out of his waistband where he had hidden it.  Without a firearm, appellant ran from the apartment and Bowling followed.  Bowling hid in the bushes outside the apartment.  Appellant ran to their getaway car, driven by his sister, Latisha Garrett.  Mike Garrett remained in the apartment on the second floor.  Mike Garrett stood at the top of the stairs, holding a gun to Peck's head.  Hibbard ordered Mike Garrett to end his attack on Peck and leave the apartment.  Mike Garrett began to leave the premises.  As he was

---

[2]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence."  Petitioner has neither cited nor presented any evidence to rebut the Ohio Court of Appeals' factual findings quoted herein.  Therefore, he has not shown that such findings are erroneous.

walking down the stairs from the apartment's second floor, he turned toward Hibbard. Hibbard, believing Mike Garrett still had a firearm, fired a shot at Garrett. However, Mike Garrett had dropped his firearm. Mike Garrett continued out the door, running out of the apartment. Hibbard followed, firing the gun in a swinging arc as he left the apartment.

Once appellant, Mike Garrett, and Bowling were all in Latisha's car, they drove away. Mike Garrett stated that he had been shot. Mike Garrett was taken to the hospital where he subsequently died from a gunshot wound to his back.

Appellant was charged with kidnapping, aggravated burglary, and murder on December 27, 2001. It was alleged that appellant caused the death of his brother, Mike Garrett, as a result of committing, or attempting to commit an offense of violence. . . .

(*Id.,* Ex. 8, pp. 1-3).

Prior to trial, petitioner's counsel filed a motion requesting the issuance of an "Order to prepare a transcript of the Grand Jury Proceedings in this matter so that Defendant may inspect said transcript prior to trial or in the alternative so that Defendant may inspect said transcript during the course of trial." (*Id.*, Ex. 2). It appears from the record that although the grand jury proceeding was transcribed as requested by petitioner's counsel, he was not provided the opportunity to review the witnesses' testimony prior to trial. (*See id.,* Ex. 5, p. 5; Ex. 8, p. 4). The matter proceeded to trial before a jury, where counsel for the defense again requested and was denied permission to review the grand jury testimony of State witness Delmar Whitesell when Whitesell testified at trial. (*See id.,* Ex. 13).

After hearing all the evidence, the jury found petitioner guilty as charged. (*Id.,* Ex. 3). On May 9, 2002, petitioner was sentenced to a fifteen (15) year to life term of imprisonment for the murder offense, as well as six (6) year terms of imprisonment for the kidnapping and aggravated burglary offenses. (*Id.,* Ex. 4). Although the sentences for murder and kidnapping were to be served concurrently, the sentence for aggravated burglary was to be served consecutively to the sentence for kidnapping, thereby resulting in an aggregate prison term of twenty-one (21) years to life. (*See id.* & Brief, p. 3).

With the assistance of new counsel for appeal purposes, petitioner timely appealed to the Ohio Court of Appeals, Twelfth Appellate District, raising the following assignments of error:

> 1.  The trial court erred to the prejudice of defendant-appellant when it refused to allow him to inspect the grand jury testimony of the State's witnesses.
>
> 2.  The trial court erred to the prejudice of defendant-appellant when it refused to provide certain jury instructions for lesser included offenses.
>
> 3.  The evidence was insufficient to justify a conviction of murder.
>
> 4.  Appellant's conviction for murder was against the manifest weight of the evidence.

(*Id.,* Ex. 5).  On September 22, 2003, the Ohio Court of Appeals overruled these assignments of error and affirmed the trial court's judgment of conviction.  (*Id.,* Exs. 8-9).

With the assistance of yet another new attorney from the Ohio Public Defender's Office, petitioner timely appealed to the Ohio Supreme Court, claiming as the sole proposition of law that "[w]hen the State uses grand jury testimony to impeach its own witness, a defendant must be allowed to inspect such testimony for further inconsistencies." (*Id.,* Ex. 10).  On January 21, 2004, the Ohio Supreme Court summarily denied petitioner leave to appeal and dismissed the appeal "as not involving any substantial constitutional question."  (*Id.,* Ex. 12).

The instant petition was first "received" for filing on January 25, 2005, and was ultimately stamped as "filed" on February 16, 2005. (*See* Doc. 1).  It appears from the face of the petition that petitioner is alleging as grounds for relief the same claims that he raised on direct appeal to the Ohio Court of Appeals.  (*See id.,* pp. 3, 6).  He also generally asserts "ineffective assistance of counsel" as a ground "in this petition that has not been presented in some state or federal court."  (*Id.,* p. 7).

Respondent does not argue in the return of writ, nor does it appear from the record, that this case triggers any concerns of a statute of limitations bar to review.

4

It also appears that this case does not pose any exhaustion issues.[3]  Therefore, the Court will proceed to address petitioner's claims for relief in light of respondent's arguments that are asserted as defenses in the return of writ.


# OPINION


## A.  Petitioner Has Waived All Grounds For Relief, Except For His Claim Challenging The Non-Disclosure Of Grand Jury Testimony, Due To His Procedural Defaults In The State Courts

In the return of writ, respondent contends that petitioner has waived all but one of his claims for federal habeas relief due to his procedural defaults in the state courts.  (Doc. 3, Brief, pp. 7-12).  It is respondent's position that petitioner only may obtain review of the sole claim presented on direct appeal to both the Ohio Court of Appeals and Ohio Supreme Court challenging the trial court's denial of his requests for review of the State witnesses' grand jury testimony.  (*Id.,* p. 12).  Respondent's argument has merit.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action.  *See* 28 U.S.C. § 2254(b)(1), (c)*; see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971).  A constitutional claim for relief must be presented to the

---

[3]Petitioner has generally alleged for the first time that he was denied effective assistance of counsel, without setting forth any facts in support of this claim.  To the extent he seeks to challenge his trial counsel's performance based on evidence outside the record, he arguably still could pursue state post-conviction relief under Ohio Rev. Code § 2953.21.  Moreover, he could file a delayed motion to reopen his appeal under Ohio R. App. P. 26(B) to the extent he seeks to challenge the conduct of his counsel on direct appeal to the Ohio Court of Appeals.  However, there are time requirements for commencing these actions, which have long since expired at this late juncture.  In any event, in the absence of any factual allegations supporting his ineffective assistance of counsel claim, the Court concludes that the claim is simply too conclusory and speculative to justify a dismissal of the petition without prejudice or a stay of this action so that petitioner can exhaust a state remedy, which may or may not be available for him to pursue depending on the facts underlying such claim.

state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir.), *cert. denied,* 474 U.S. 831 (1985).

If petitioner fails to fairly present his claims through the requisite levels of state appellate review to the state's highest court or commits some other procedural default relied on to preclude review of the merits of the claims by the state's highest court, and if no avenue of relief remains open or if it would otherwise be futile for petitioner to continue to pursue his claims in the state courts, his claims for habeas corpus relief are subject to dismissal with prejudice on the ground that they are waived.  *See O'Sullivan,* 526 U.S. at 847-848; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).  If, because of a procedural default, petitioner has not had his claims considered by the state's highest court and he can no longer present his claims to the state courts, he has waived such claims for purposes of federal habeas corpus review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, as respondent has pointed out (*see* Doc. 3, Brief, p. 11), petitioner committed a procedural default with respect to his general allegation of "ineffective assistance" by counsel, because he never raised any claim to the state courts challenging the performance of either his trial or appellate counsel.  He also committed a procedural default in the state appeal proceedings by failing to assert as propositions of law in his memorandum in support of jurisdiction to the Ohio Supreme Court three of the four assignments of error that he had raised on direct appeal to the Ohio Court of Appeals.

By thus failing to provide the Ohio Supreme Court with the opportunity to correct any of these alleged errors, petitioner has waived all but one of his claims for federal habeas corpus relief unless he can show cause for his defaults and actual prejudice as a result of the alleged errors, or demonstrates that failure to consider the defaulted claims will result in a "fundamental miscarriage of justice."  *See, e.g., O'Sullivan,* 526 U.S. at 845, 848; *Leroy,* 757 F.2d at 97, 99-100; *see also Coleman,*

6

501 U.S. at 750; *see also Murray,* 477 U.S. at 485; *Isaac,* 456 U.S. at 129; *Sykes,* 433 U.S. at 87.

Petitioner may be arguing "cause" for his default to the extent his "ineffective assistance of counsel" claim may be premised on the failure of his counsel from the Ohio Public Defender's Office, who represented him on discretionary appeal to the Ohio Supreme Court, to assert all of the claims of error that had been raised to the Ohio Court of Appeals on his first appeal as of right. However, although ineffective assistance of appellate counsel may constitute cause for a procedural default, *Murray,* 477 U.S. at 488, the Sixth Amendment right to counsel, which includes the right to effective assistance, does not extend beyond the first appeal as of right to a discretionary appeal. *See Coleman v. Thompson,* 501 U.S. 722, 755-57 (1991) (relying on *Ross v. Moffitt,* 417 U.S. 600, 616 (1974), and *Pennsylvania v. Finley,* 481 U.S. 551, 556 (1987)). Therefore, petitioner cannot demonstrate "cause" for his default based on such an argument.[4]

Finally, petitioner has not demonstrated a "fundamental miscarriage of justice" will occur if his procedurally-defaulted claims are not considered on the merits herein. Under the "fundamental miscarriage of justice" exception to the waiver doctrine, petitioner must demonstrate that the alleged constitutional violations "probably resulted in the conviction of one who is actually innocent" of the crimes charged. *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995); *cf. Souter v. Jones,* 395 F.3d 577, 597-602 (6th Cir. 2005).

Under this "actual innocence" standard, the otherwise-barred petitioner "must show it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt" in light of all the evidence, "including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup,* 513 U.S. at 327-28 (citing with approval the standard enunciated by Judge Friendly in a 1970 law review article, *Is Innocence Relevant? Collateral Attack on Criminal Judgments,* 38 U.Chi.L.Rev. 142, 145 (1970)). To be credible, a

---

[4]*Cf. Mapson v. Russell,* 869 F.2d 1491 (table), No. 88-3959, 1989 WL 16211, at **1 (6th Cir. Feb. 23, 1989) (unpublished) (affirming denial of petition alleging ineffective assistance of post-conviction appellate counsel as "not cognizable in federal habeas corpus," because "[t]here is no right to counsel that arises under the sixth amendment in a discretionary appeal from a judgment of conviction").

claim of actual innocence requires petitioner to support his allegations "with new reliable evidence . . . that was not presented at trial" either because it was wrongly excluded or unavailable at the time of trial. *Schlup,* 513 U.S. at 324. Establishing actual innocence requires a showing of factual innocence, not mere legal insufficiency. *See Bousley v. United States,* 523 U.S. 614, 623 (1998); *Hampton v. United States,* 191 F.3d 695, 703 (6th Cir. 1999).

Here, petitioner has not provided the Court with any "new" evidence not presented at his state trial to establish a credible claim of actual innocence. Petitioner has made no showing of his "factual innocence," and is unable to demonstrate his "actual innocence" under *Schlup* based on the argument, alleged as a ground for relief in the petition, that the evidence was insufficient as a matter of law to establish his guilt beyond a reasonable doubt on the murder charge. *Cf. id.*

Accordingly, in sum, because petitioner has neither demonstrated "cause" for his procedural defaults in the state courts nor made a sufficiently credible showing of his "actual innocence" in this case, petitioner has waived all his claims for relief except for the claim, presented as the sole proposition of law to the Ohio Supreme Court in the state direct appeal proceedings, challenging the trial court's denial of his requests to inspect State witnesses' grand jury testimony.

### B.  Petitioner Is Not Entitled To Habeas Relief Based On His Non-Waived Claim Challenging The Trial Court's Denial Of His Requests To Review State Witnesses' Grand Jury Testimony

In the only ground that remains for review on the merits by this Court, petitioner alleges that the "[t]rial court erred to [his] prejudice . . . when it refused to allow him to inspect the grand jury testimony of the State's witnesses. (Doc. 1, pp. 3, 6).

The Ohio Court of Appeals, which was the only state court to issue a reasoned decision addressing the merits of this claim on direct appeal, overruled petitioner's assignment of error as follows:

Whether to release grand jury testimony is within the discretion of the trial court, and a denial of a motion to inspect such testimony will not be reversed absent an abuse of that discretion. . . .  The term "abuse of

discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."...

Crim.R. 6(E) provides that "[a] grand juror, prosecuting attorney, interpreter, stenographer, operator of a recording device, or typist who transcribes recorded testimony, may disclose matters occurring before the grand jury *** only when so directed by the court[.]" Grand jury proceedings are secret, and "an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Greer* (1981), 66 Ohio St.2d 139, paragraph two of the syllabus. Generally, a particularized need for the disclosure of grand jury testimony "is shown where from a consideration of all the surrounding circumstances it is probable that the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed in issue by the witness' trial testimony." Id., paragraph three of the syllabus.

In the case at bar, appellant moved to transcribe the grand jury testimony of the various witnesses. During Delmar Whitesell's testimony at trial, the prosecutor employed Whitesell's prior statements to the grand jury to refresh his recollections of the events. Defense counsel requested an inspection of the grand jury transcripts to determine if there were any discrepancies in Whitesell's testimony. The court reviewed the grand jury testimony and noted only minor discrepancies. After reviewing the transcripts, the court determined that the testimony was not so inconsistent or contradictory that inspection by appellant's counsel would be appropriate. The court found that the witness did not change his position or his account of the events during the trial.

Appellant has failed to show an abuse of discretion by the trial court in reaching this determination. When a defendant "speculates that the grand jury testimony might have contained material evidence or might have aided his cross-examination *** by revealing contradictions, the trial court does not abuse its discretion by finding the defendant had not shown a particularized need.". . . Therefore, the . . . assignment of error is overruled.

9

(Doc. 3, Ex. 8, pp. 3-5) (citations to state cases omitted).

In this case, the state appellate court evaluated the merits of petitioner's claim under an "abuse of discretion" standard of review established by state law. In the usual case, a federal habeas petitioner is not entitled to relief unless the state court's adjudication of his constitutional claim resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 402-03 (2000) (O'Connor, J., writing for majority on this issue). However, in a case such as this, where the state court addressed petitioner's claim solely in terms of state law, the federal court must conduct a *de novo* review, instead of applying the more deferential standard of review set forth in § 2254(d). *Clinkscale v. Carter,* 375 F.3d 430, 436 (6th Cir. 2004), *cert. denied,* 543 U.S. 1177 (2005); *Maples v. Stegall,* 340 F.3d 433, 436-37 (6th Cir. 2003) (citing *Wiggins v. Smith,* 539 U.S. 510 (2003)).[5]

The Court begins its analysis of petitioner's claim by recognizing the "long-established policy," which is "older than our Nation itself," of ensuring that the secrecy of grand jury proceedings is maintained. *See Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399 (1959); *United States v. Procter & Gamble Co.,* 356 U.S. 677, 681 (1958) (and Supreme Court cases cited therein). The grand jury, which has "always occupied a high place as an instrument of justice in our system of criminal law–so much so that it is enshrined in the Constitution" for federal court proceedings, serves the "dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded accusations." *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 423 (1983); *see also Butterworth v. Smith,* 494 U.S. 624, 629 (1990). The tradition of secrecy surrounding grand jury proceedings evolved as a means to implement these dual functions. *Sells Engineering,* 463 U.S. at 424.

The Supreme Court has explained:

To make public any part of [the grand jury] proceedings would

---

[5]*See also Joseph v. Coyle,* __ F.3d __, Nos. 05-3111, 05-3113, 2006 WL 3250935, at *6, 24 (6th Cir. Nov. 9, 2006) (and cases cited therein) (to be published); *Towns v. Smith,* 395 F.3d 251, 257 (6th Cir. 2005); *Newton v. Million,* 349 F.3d 873, 877 (6th Cir. 2003).

10

inevitably detract from its efficacy. Grand jurors would not act with the independence required of an accusatory and inquisitorial body. Moreover, not only would the participation of the jurors be curtailed, but testimony would be parsimonious if each witness knew that his testimony would soon be in the hands of the accused.

*Pittsburgh Plate Glass,* 360 U.S. at 400; *see also Procter & Gamble,* 356 U.S. at 682 ("The grand jury as a public institution serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow.").[6] Therefore, the Supreme Court has held firm to the principle that the "'indispensable secrecy of grand jury proceedings[]' . . . must not be broken except where there is a compelling necessity." *Procter & Gamble,* 356 U.S. at 682 (quoting *United States v. Johnson,* 319 U.S. 503, 513 (1943)).

The Supreme Court has recognized that there are instances when the need for disclosure "will outweigh the countervailing policy" of ensuring the secrecy of grand jury proceedings. *Id.*; *see also Butterworth,* 494 U.S. at 630 (quoting *United States v. Dionisio,* 410 U.S. 1, 11 (1973) ("we have recognized that the invocation of grand jury interests is not 'some talisman that dissolves all constitutional protections'"); *cf. Dennis v. United States,* 384 U.S. 855, 870-71 (1966) (discussing developments in the federal case-law with respect to the application of Fed. R. Crim. P. 6(e), favoring "disclosure, rather than suppression, of relevant" portions of the grand jury testimony

---

[6]The Supreme Court has noted additional distinct interests that are "served by safeguarding the confidentiality of grand jury proceedings." *Butterworth,* 494 U.S. at 630. Specifically, quoting from *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218-19 (1979), the Court has pointed out that:

 [I]f preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against the indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Id.; see also Sells Engineering,* 463 U.S. at 424.

11

of a criminal trial witness for the purpose of promoting "the proper administration of criminal justice"); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 234 (1940) ("after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it").    However, those instances "must be shown with particularity."  *Procter & Gamble,* 356 U.S. at 682.

In *Procter & Gamble,* 356 U.S. at 682-83, the Supreme Court indicated that disclosure of a grand jury transcript may be required if shown that the "defense would be greatly prejudiced or that without reference to it an injustice would be done," such as where "use of the grand jury transcript at trial [is necessary] to impeach a witness, to refresh his recollection, to test his credibility and the like."  The Court stated: "Those are cases of particularized need where the secrecy of the [grand jury] proceedings is lifted discretely and limitedly."  *Id.* at 683.  On the other hand, the Court rejected the position taken by the defense in that civil suit that it was entitled to the "wholesale discovery and production" of the entire grand jury transcript where the sole basis for discovery was that the transcript had been made available to the government in preparation of its case.  *See Dennis,* 384 U.S. at 869 (discussing *Procter & Gamble* decision).

Of particular relevance, in *Pittsburgh Plate Glass,* 360 U.S. at 399-401, the Supreme Court affirmed the trial court's refusal to order disclosure of a trial witness's grand jury testimony to the criminal defendant, because the defense had not met its burden of showing a "particularized need" existed which outweighed the policy of secrecy simply by arguing that it had an absolute right to the witness's grand jury testimony for cross-examination purposes.   Moreover, in *Socony-Vacuum Oil,* 310 U.S. at 232-34, the Supreme Court held that the district court did not abuse its discretion under federal law in refusing to disclose the grand jury transcript to the defense in a case where the government's counsel and trial court had refreshed certain witnesses' recollection by reading from their grand jury testimony.  In so ruling, the Court pointed out that the trial judge supervised the procedure that was used to refresh the witnesses' recollection with "commendable fairness;" that the case did not involve the deliberate use of "refreshing material . . . for purposes not material to the issues but to arouse the passions of the jurors;" and that the grand jury testimony was not introduced as "independent affirmative evidence" or for impeachment purposes, but rather "simply to refresh the [witnesses'] recollection on material facts."  *Id.* at 234.

In contrast, in *Dennis*, the Supreme Court held that the petitioners had shown a particularized need under Fed. R. Crim. P. 6(e), which entitled them to examine the

grand jury testimony of four government witnesses while those witnesses were available for cross-examination at trial, in a case where the government conceded the balancing of interests favored disclosure. *Dennis,* 384 U.S. at 871-73. In so ruling, the Court rejected the view taken by the court of appeals that "it is 'safe to assume' no inconsistencies would have come to light if the grand jury testimony [within the exclusive possession of the prosecution] had been examined." *Id.* The Court indicated that "when there is a showing of a 'particularized need' for disclosure," such as was involved in that case, it would have been inappropriate for the trial court to follow the procedure adopted in some circuits of first conducting an *in camera* inspection to determine if there were any inconsistencies in the witness's grand jury testimony before permitting the defense access to such testimony.[7]

Ohio R. Crim. P. 6(E), which governs the disclosure of grand jury testimony as a matter of state-law, incorporates the "long-standing tradition of grand jury secrecy" and the weighing of interests recognized by the Supreme Court in the cases discussed above. *See State v. Greer,* 420 N.E.2d 982, 987 (Ohio 1981). The Ohio Supreme Court has held that under Ohio R. Crim. P. 6(E), the trial court is required, "upon proper motion, to consider the basis of the particularized need advanced by the defendant," which "may be accomplished by an in camera inspection of the grand jury minutes by the trial court assisted by counsel." *Id.* at 989.

In this case, petitioner is unable to obtain relief based on any claim that the trial court denied his requests for disclosure of the grand jury transcript in violation of Ohio R. Crim. P. 6(E) and state case-law applying that rule. *See* 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). Moreover, given the important interest of grand jury secrecy discussed above, which is recognized by both the federal and state

---

[7]In concluding that the "trial judge's function . . . is limited to deciding whether a case has been made for production, and to supervise the process," the Court stated that it did not disapprove of the practice of *in camera* inspection of grand jury testimony by the trial judge in order to decide whether the defense had demonstrated a "particularized need" for disclosure in the first place. *Dennis,* 384 U.S. at 874-75. In any event, it appears that the Court's decision in *Dennis* was not based on constitutional grounds, but rather on a determination of the proper procedure to be followed by the federal courts under rules that are not constitutionally required and thus need not be applied by the state courts. *See United States v. Margeson,* 261 F. Supp. 628, 629 (E.D. Pa. 1966); *State v. Greer,* 420 N.E.2d 982, 986-87 (Ohio 1981); *cf. Pennsylvania v. Ritchie,* 480 U.S. 39, 60, 65-66 (1987) (plurality opinion) (discussed *infra* pp. 15-16).

courts, petitioner is unable to prevail on any claim that he had a constitutionally-protected right to obtain access to the entire grand jury transcript or even a portion of the transcript in the absence of a showing with some particularity of a need for disclosure. *See, e.g., Procter & Gamble,* 356 U.S. at 682.

Petitioner has raised arguments to the effect that a "particularized need" for disclosure of State witness Delmar Whitesell's grand jury testimony was shown and that, therefore, the denial of his requests to inspect such testimony deprived him of a fair trial. Specifically, as derived from his state appellate briefs, petitioner essentially contends his constitutional rights were violated because, although the prosecutor was allowed to use Whitesell's grand jury testimony to refresh his recollection at trial and to impeach some of his trial testimony, defense counsel was "den[ied] the same right." (*See* Doc. 3, Exs. 5, 7). Petitioner further argues that because he was prohibited from viewing "grand jury testimony in the State's possession that could have been, and actually was, used to impeach Whitesell," he was prevented from "fully expos[ing] on cross-examination all inconsistencies with Whitesell's former sworn testimony before the grand jury." (*Id.,* Ex. 10, p. 8; *see also* Exs. 5, 7).

The Due Process Clause of the Fourteenth Amendment requires the prosecution to disclose evidence in its possession that is both favorable to the accused and material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87 (1963); *see also Pennsylvania v. Ritchie,* 480 U.S. 39, 57 (1987) (plurality opinion); *United States v. Bagley,* 473 U.S. 667, 674 (1985). A "defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [State's] files." *Ritchie,* 480 U.S. at 59; *see also Weatherford v. Bursey,* 429 U.S. 545, 559 (1977). The purpose of *Brady* is not to displace the adversary system as the primary means to uncover the truth, but rather to ensure that a miscarriage of justice does not occur. *Bagley,* 473 U.S. at 675. Therefore, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. *Id.*

The defendant is deprived of a fair trial "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 678. Evidence is material if there is a reasonable probability that the result of the trial would have been different had the evidence been disclosed to the defense. *Ritchie,* 480 U.S. at 57.

Impeachment evidence, as well as exculpatory evidence, falls within the *Brady*

14

rule. *Bagley,* 473 U.S. at 676. Impeachment evidence is considered "evidence favorable to the accused" because the jury's assessment of the reliability and truthfulness of a given witness may well be determinative of the defendant's guilt or innocence. *Id.; see also Giglio v. United States,* 405 U.S. 150, 153 (1972).

In *Ritchie,* which is analogous to the case-at-bar to the extent petitioner claimed that he was denied due process because he was not allowed access to a state agency's confidential investigatory records, the Supreme Court recognized that disclosure of otherwise privileged records may be required in certain circumstances based on a "plausible showing" by defendant that they contain relevant information both material and favorable to the defense. *Ritchie,* 480 U.S. at 60. The Court held, however, that the interest of ensuring a fair trial would be fully protected by requiring the files to be "submitted only to the trial court for *in camera* review." *Id.* at 60. The Court reasoned:

> Although this rule denies [defendant] the benefits of an "advocate's eye," we note that the trial court's discretion is not unbounded. If a defendant is aware of specific information contained in the file . . ., he is free to request it directly from the court, and argue in favor of its materiality. Moreover, the duty to disclose is ongoing; information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release information material to the fairness of the trial.

*Id.*

In his opinion concurring in part and concurring in the judgment, Justice Blackmun disagreed with the plurality to the extent it was his view "there might well be a confrontation violation if, as here, a defendant is denied pretrial access to information that would make possible effective cross-examination of a crucial prosecution witness. *Id.* at 61-62. However, Justice Blackmun went on to state: "I am able to concur in the Court's judgment because, in my view, the procedure the Court has set out for the lower court to follow on remand is adequate to address any confrontation problem." *Id.* at 65. In so concluding, he pointed out:

> Under the Court's prescribed procedure, the trial judge is directed to review the . . . file for "material" information. . . . This information would certainly include such evidence as statements of the witness that

15

might be used to impeach her testimony by demonstrating any bias towards [the defendant] or by revealing inconsistencies in her prior statements.  When reviewing confidential records in future cases, trial courts should be particularly aware of the possibility that impeachment evidence of a key prosecution witness could well constitute the sort whose unavailability to the defendant would undermine confidence in the outcome of the trial. . . .  [T]he trial court's obligation to review the confidential record for material information is ongoing.  Impeachment evidence is precisely the type of information that might be deemed to be material only well into the trial, as, for example, after the key witness has testified.

*Id.* at 65-66.

Here, petitioner has not demonstrated that his constitutional rights were violated by the state courts' rulings pertaining to his requests to review the grand jury testimony of State witness Delmar Whitesell.

Whitesell was present at the scene when the incident resulting in the death of petitioner's brother occurred, and testified at trial about the events he observed at that time. The prosecutor initially referred to Whitesell's grand jury testimony during Whitesell's direct examination after Whitesell testified that he "totally believed" the victim, Michael Garrett, "still might have [had a firearm] with him" when he reached the bottom of the stairs immediately before being shot by Hibbard, although he "could only see so much of" Garrett at that moment in time given that Hibbard "was in between me and . . . Garrett." (*See* Doc. 3, Ex. 13, Tr. 55).  When asked what he told the grand jury, Whitesell stated: "I believe I said that no, I don't recall a gun being in his hands."  (*Id.*).

At a later juncture in Whitesell's direct examination, the following colloquy occurred:

Q.  When you, taking you back to that point in time when you saw Mr. Garrett coming down the steps, did you see Mr. Garrett come down the stairs first?  His gun come down the stairs first?  What did you see first?

A.  Well, actually I saw him, Mike Garrett coming down the stairs, and as soon as I could make contact, you know, eye contact with him coming

down the stairs, it was pretty much simultaneous, you know.  I saw him and then I saw him drop the gun.

Q.  Okay.  Do you remember me asking you at Grand Jury, I think you saw − . . . .

(*Id.*, Tr. 64).

At that point, petitioner's counsel objected to the question posed by the prosecutor, and a sidebar conference was held, wherein the prosecutor asserted that he was questioning Whitesell about his grand jury testimony not for the purpose of refreshing Whitesell's recollection but to "actually impeach him with his prior testimony." (*Id.,* Tr. 64-65).  During this sidebar conference, counsel for co-defendant Hibbard stated that she was renewing her request for Whitesell's grand jury testimony. (*Id.,* Tr. 66).  After the conference concluded, Whitesell's direct examination continued in relevant part as follows:

Q.  Do you remember whether you saw Mike Garrett or the gun come down the stairs first?

A.  The gun made it down the stairs first because when it fell, it fell through the railing of the stairs, so it hit the ground before Mike Garrett had got . . . to the bottom of the stairs if that's what, that's what you're wanting to know.

Q.  Just asking you some questions.

A.  So yes, it did get to the bottom of the stairs before Mike Garrett did.

Q.  Isn't it accurate that you saw the gun come down the stairs before you saw Mike Garrett?

A.  Is it accurate to say it?

Q.  Yes.

A.  Yes, it's accurate to say that.

Q.  And as a matter of fact, how did Mr. Garrett take those last couple of steps?

A.  He leaped down.

Q.  And how would you characterize that leap that he took?

A.  I'd characterize the leap that he took as he leaped down the last three to four stairs facing J.J. [Hibbard] so when he go[t] to the bottom of the stairs he would be facing the man with the gun at the bottom of the stairs.

Q.  Okay.  And did, did he appear injured at that time?

A.  No.

(*Id.,* Tr. 67-68).

Prior to Whitesell's cross-examination, both petitioner's counsel and counsel for co-defendant Hibbard again requested the "grand jury transcripts of this witness or at least to have the court['s] *in camera* inspection of those transcripts, and to have a copy of the . . . witness statement that . . . this witness ha[s] given." (*Id.,* Tr. 75). It appears from the record that as requested by defense counsel, the trial court conducted an *in camera* inspection of Whitesell's grand jury testimony and provided both defense counsel with a copy of Whitesell's witness statement. (*See id.,* Tr. 109-112, 146-47). After reviewing Whitesell's grand jury testimony, the court found only a "couple of minor inconsistencies" in the testimony, which it determined were insufficient to justify disclosure of the grand jury transcript to defense counsel. (*See id.,* Tr. 146-47, 152).

Based on the present record, the Court concludes that petitioner has not shown that the undisclosed grand jury testimony of Whitesell was "material," or in other words, that there is a reasonable probability that the result of petitioner's trial would have been different had such evidence been disclosed to petitioner. First, petitioner is unable to argue, nor is there evidence in the record even remotely suggesting, that the trial court's *in camera* review of Whitesell's grand jury testimony, for the purpose of determining whether it contained *Brady* material subject to disclosure to the defense, was inadequate to ensure the fairness of his trial. *Cf. Ritchie,* 480 U.S. at 60, 65-66.  Moreover, petitioner has neither argued nor cited any evidence to refute the

18

trial court's finding upon review of the grand jury transcript that there were only "minor inconsistencies" in Whitesell's grand jury and trial testimonies, which would not have been sufficient to discredit Whitesell's trial testimony or change the outcome of the trial. *Cf. United States v. Elem,* 269 F.3d 877, 881-82 (7th Cir. 2001) (and cases cited therein) (rejecting *Brady* claim when trivial discrepancies existed between trial and grand jury testimony), *cert. denied,* 535 U.S. 945, 963 (2002).

Second, it appears from the record that the prosecution brought out the only arguably material discrepancy between Whitesell's grand jury and trial testimonies to the extent Whitesell may have given the impression during his direct examination that the victim might have still been holding a gun when he was shot by Hibbard. Contrary to petitioner's contention, he was not deprived of a fair trial simply because such information was elicited to refresh Whitesell's recollection, or even for impeachment purposes, by the prosecution rather than the defense. Petitioner has not shown how the defense could have further impeached Whitesell by reference to his grand jury testimony found to contain only "minor inconsistencies" by the trial court.

In any event, it is clear from the record that although arguably pertinent to the issue of Hibbard's guilt or innocence for murder in the face of a possible defense of self-defense, the discrepancy brought out at trial between Whitesell's grand jury and trial testimonies was not relevant in deciding petitioner's culpability on the felony murder charge brought against him –i.e., that petitioner caused the victim's death as a result of committing or attempting to commit an act of violence, which in this case formed the basis of the kidnapping and aggravated burglary charges brought against him. As the Ohio Court of Appeals reasonably found in this case (*see* Doc. 3, Ex. 8, p. 5), Whitesell remained unwavering in his account of the events that he observed regarding the underlying violent felonies committed by petitioner, which ultimately resulted in the victim's death at the hands of Hibbard.

Specifically, Whitesell consistently testified with firm conviction, even when confronted with certain minor inconsistent statements contained in his statement to the police as to when exactly guns were pulled out and who remained downstairs when Greg Peck was taken upstairs to check out a "noise," that when he entered Peck's apartment, he saw the victim, petitioner, and co-defendant Brad Bowling involved in an argument with Peck, where both the victim and Bowling displayed guns; that he was forced to remain in the apartment by Bowling, who "put the nine to my head and forced me to sit down;" that at one point in the altercation with Peck, petitioner also pulled out a gun, "[s]o now we have all three of them out;" that he and others in the

apartment held at gunpoint by the victim, petitioner and Bowling were in fear for their lives; that on two occasions during the altercation, the victim handed his gun to petitioner, first, to hit Peck in the head several times and, second, to retrieve a knife to cut Peck's throat while holding Peck in a headlock; that no one present at the scene could do anything to help Peck, because "we've got guns on us;" that although Peck was able to free himself from the headlock and run for the back door of the apartment, he was caught and dragged back into the living room; and that he and Hibbard and another occupant in the apartment were held at gunpoint by petitioner while the victim and Bowling took Peck upstairs for the purpose of checking out a "noise" the victim thought he had heard from upstairs.[8]  (*Id.,* Ex. 13, Tr. 38-47, 82-89, 95-96, 104-06, 111-19, 138-41).  At that point, petitioner was disarmed by Hibbard, who pulled out his own gun, and petitioner fled the premises followed by Bowling.[9]  (*Id.,* Tr. 47-50, 89-90, 121).

Accordingly, in sum, the Court concludes that petitioner has not demonstrated that the trial court's *in camera* review of Whitesell's grand jury testimony was insufficient to adequately protect petitioner's interest in a fair trial as weighed against the well-established policy of protecting the secrecy of grand jury proceedings. Moreover, in the absence of any evidence indicating that the withheld grand jury transcript contained material evidence favorable to his defense under *Brady*, petitioner has not shown that he was denied a fair trial by the trial court's refusal to grant his requests to review the grand jury transcript under the circumstances presented herein.

---

[8]During Whitesell's cross-examination, evidence was introduced that Whitesell initially told police that Bowling remained downstairs while the victim and petitioner accompanied Peck upstairs to check out the suspicious "noise."  (Doc. 3, Ex. 13, Tr. 113).  Whitesell explained that he was "confused" about "which one was which" when he gave his statement to the police.  (*Id.,* Tr. 140).  In any event, even assuming the prior inconsistent statement to the police undermined petitioner's trial testimony as to who remained downstairs and who accompanied Peck upstairs at that juncture in the altercation, the discrepancy would not have affected the jury's verdict regarding petitioner's participation in the "acts of violence" of kidnapping and aggravated burglary underlying the felony murder charge against him.

[9]Whitesell further testified that before following petitioner out of the premises, Bowling put a gun on him as he tried to jump through the glass of the back door and made him "lay back down on the ground after . . . bust[ing] me with [the gun] a couple of times."  (Doc. 3, Ex. 13, Tr. 48; *see also id.,* Tr. 50, 94-95).  Whitesell also testified that Bowling fired back into the house as he fled the premises.  (*Id.,* Tr. 50, 99, 120).

20

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2.  A certificate of appealability should not issue with respect to the claims for relief, which this Court has concluded are waived and thus barred from review on procedural grounds, because "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling.  *See Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000).[10]  A certificate of appealability also should not issue with respect to petitioner's remaining claim challenging the denial of his requests for disclosure of the grand jury transcript, which has been addressed on the merits herein, because petitioner has failed to make a substantial showing of the denial of a constitutional right in that ground for relief.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore DENY petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: 11/20/2006                   s/Timothy S. Hogan

       cbc                                  Timothy S. Hogan
                                            United States Magistrate Judge

J:\BRYANCC\2006 habeas orders\05-102denypet.waiv-OhSCt.grandjurytestimony-brady.wpd

---

[10]  Because this Court finds that the first prong of the two-part *Slack* standard has not been met in this case, it need not address the second prong of *Slack* as to whether or not "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim in any of his "waived" grounds for relief.  *See Slack*, 529 U.S. at 484.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Marchelo Garrett,
      Petitioner,

                                     Case No. 1:05cv102

      v.                           (Weber, S.J.; Hogan, M.J.)

Ernie Moore,
      Respondent.

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action.  Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s).  Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections. *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

1:05cv102 Doc 8

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ ☐ Agent  ☐ Addressee<br>B. Received by ( *Printed Name*)  C. Date of Delivery |
| 1. Article Addressed to:<br><br>Marchelo Garrett 427-133<br>Lebanon Corr. Inst.<br>PO Box 56<br>Lebanon, OH 45036 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br><br>3. Service Type<br>☐ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? *(Extra Fee)*  ☐ Yes |
| 2. Article Number<br>(Transfer from service label)  7002 0860 0006 5230 5295 | |

| PS Form 3811, August 2001 | Domestic Return Receipt | 102595-02-M-0835 |